Meyer v Adams Publishing Group

FILED - GR

October 21, 2024 11:58 AM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: KB   SCANNED BY: KB 10/22

United States District Court for the Western District of Michigan

ANN A. MEYER
Plaintiff

V

**2:24-cv-176**
Robert J. Jonker
U.S. District Judge

ADAMS PUBLISHING GROUP
Defendant

Ms. Ann Meyer, Pro Se

Formerly of
425 6th Ave Apt 2
Menominee, MI 49858

Currently residing at
3308 Central St.
Evanston, IL 60201
ameyerwrtr@aol.com
annmeyerann@gmail.com
847-256-7106 (desk phone)
847-271-0177 (cellphone)

Adams Publishing Group
c/o Ms. Katharine Glass
VP/Human Resources
Adams Publishing Group
Minneapolis, MN 55433
423-359-3166
info@adamspg.com

## COMPLAINT

NOW COMES PLAINTIFF Ann Meyer, *pro se*, and brings forth a Complaint against DEFENDANT Adams Publishing Group and in the pursuit of justice states the following:

The first step in addressing an issue is knowing it exists. The courts understand this, and so do journalists, who often help to hold those in power accountable through the news articles they produce. Neither should be blocked from doing their jobs, nor harassed. The PLAINTIFF, a professional journalist with disabilities and a former employee in high regard at the company named in this complaint, was retaliated against and excluded for no reason other than discrimination when she was interrupted from working on a news article about a Menominee, Michigan, schools referendum on the November 2022 ballot, which was in the public's interest with an election day the following Tuesday. This interference and harassment also was a violation of several federal laws, including those guarding a professional journalist's Constitutional right to inform the public, as the PLAINTIFF was hired to do. The Americans with Disabilities Act stipulates employers must provide access and reasonable accommodations. It also prohibits discrimination, including exclusion, retaliation and coercion.

1

Meyer v Adams Publishing Group

The ADA was amended in 2008 to broaden the definition of disability, after Congress found the original law was being narrowly interpreted and leaving out the very people Congress had intended to include. The result was the Americans with Disabilities Act Amendments Act of 2008 (ADAAA), which affords the same protections as the ADA but qualifies more people. Its goal is to provide access and inclusion. With disability discrimination pervasive, people often are reluctant to speak of their disabilities for fear of worsening the discrimination they face. Still, they need support because they so often are economically disadvantaged.

Congress lowered the threshold for people with disabilities to be afforded protections in the Americans with Disabilities Act Amended Act of 2008, in part because employers and courts weren't accepting the disabilities the ADA was intended to cover. The ADA AA says:

"the limitations from the impairment no longer must be severe or significant for the impairment to be considered substantially limiting, or that the employer perceive the impairment to be substantially limiting."

The law states people with disabilities aren't to be retaliated against, harassed, excluded, or barred from working or from many other activities. The law provides for access and inclusion because those with disabilities are hampered from doing tasks others might enjoy and often are economically disadvantaged.

The discrimination takes many forms, most often involving exclusion or disadvantage, such as not being considered for promotions or activities. Over time, this results in economic disadvantage. Many people with disabilities don't realize their full potential in the marketplace.

The PLAINTIFF is bringing this Complaint primarily on the basis of disability and using the ADA and ADAAA, which work in conjunction with other laws. She also faced gender, age and wage discrimination. While she was employed by Adams Publishing Group as a staff writer, her business also was harmed. More information about various relevant statutes is contained later in this complaint.

This complaint asserts the PLAINTIFF was harmed by the DEFENDANT 's discrimination, including its slander, libel and a retaliatory action that excluded the PLAINTIFF from employment and blacklisted her from future opportunities in violations of the law. In an act of retaliation, the general manager, who was in charge of the business side of the newspaper and who wasn't the PLAINTIFF's supervisor, forced the PLAINTIFF to leave her position when he called the police to have her escorted from the newsroom, instead of allowing the PLAINTIFF to do the job she was hire to do, which was to

inform the Menominee, Michigan, community with a timely news, including an article on the referendum she was working on that week.

The PLAINTIFF had written six to nine stories per week based on original reporting, primarily on news of the city and county governments, businesses and people in Menominee. This amounted to about 370 bylined news articles in 11.5 months. She also shot hundreds of original photos to accompany the stories she produced. Besides this, she brought knowledge of the media and publishing industry from over 35 years of participation.

Despite being the most productive staff writer at the EagleHerald by story count while she worked for the newspaper and despite being the only EagleHerald staff writer to survive a company layoff in June 2022, the PLAINTIFF was forced to leave her position on July 28, 2022 in an act of discrimination. This occurred about six weeks after a corporate downsizing resulted in three staff writer positions being eliminated, leaving the newsroom with just three editorial positions: the editor, the sports editor and the PLAINTIFF as the only staff writer. When the PLAINTIFF started work at the paper, the EagleHerald had six or seven full-time equivalent newsroom positions, including a contract sports writer role. The loss of these newsroom positions was noticeable and affected the PLAINTIFF's role.

This wasn't the first act of discrimination the PLAINTIFF faced, as she faced it while she was negotiating for a position over a period of about five months. She was first offered a job paying $15 or $15.50 an hour for 30 hours a week, which likely wasn't going to be sufficient to qualify for a lease. She was able to get the wage boosted to $17 an hour and the work week extended to 37.5 hours. She also faced discrimination on her first day at work, Aug. 9, 2021. Having already signed a 12-month lease on an apartment in Menominee, she was unpleasantly surprised to be coerced to sign a document containing a noncompete agreement barring her from working for competition within 50 miles of the EagleHerald. She protested this document and the company's coordinated efforts to coerce to sign it, as she was told she must sign it to work there, and she felt she had no choice because she had signed an apartment lease and moved many of her belongings to Menominee.

The DEFENDANT company could have discussed the document with the PLAINTIFF during the five months of negotiations before she had put her townhouse on the rental market, found a tenant, cleared out her belongings and either stored or moved them, but no one she interviewed with mentioned the document. The ADA and ADAAA also bar coercion, such as being forced to sign a document, as the ADA is designed to provide access and not to put up obstacles or to restrict those with disabilities, which would be exclusionary. With no communication from the DEFENDANT explaining its position, PLAINTIFF assumed she was excluded from working for competition by the noncompete, which was

triggered by "termination," as she hadn't been informed that the company considered its exclusionary action a forced resignation. She was told in May 2024 the Defendant had no intention of ever enforcing the noncompete. However, without this information in 2022, she was left without a means of income after July 2022, when her job ended, so she relied on credit cards to pay bills and incurred substantial debt as a result. She also has had to draw down from 410ks, including closing two entirely to pay bills. The DEFENDANT's noncompete did not have an end date, so the exclusion from working caused substantial financial harm to the PLAINTIFF. She had to relocate, and fortunately owned a townhouse in Illinois, or she can't fathom where she would be because of the difficulty of getting a lease without income. But the PLAINTIFF couldn't move into this townhouse in July, when her position ended, because a tenant was living there. The PLAINTIFF had to negotiate with this tenant a late October exit so she could move into the one-bedroom townhouse in Evanston, Illinois, where she is still residing. While she looked for alternative living arrangements with hopes of leasing the townhouse again, this has proved to be a challenge and she has learned the townhouse is relatively economical given the increase in housing costs so she is staying put for now. While an HR director assured the PLAINTIFF in May the DEFENDANT didn't ever intend to enforce the noncompete, this doesn't resolve the financial loss the PLAINTIFF incurred due to the company's failure to communicate this detail to her sooner.

Excluding the PLAINTIFF from writing for the EagleHerald or competition also has affected news coverage of Menominee. The traumatic way in which the PLAINTIFF was forced to leave also has damaged her reputation. She didn't deserve to be escorted out of the newsroom by the police and this action raises unnecessary questions. The DEFENDANT also interfered in the PLAINTIFF's application by failing to notify an administrative judge for the unemployment department that her resignation was forced, so she was denied this relief.

She is filing this Complaint of Discrimination on the basis of disability, per the Americans with Disabilities Act and the Americans with Disabilities Act Amendments Act, as she has several chronic medical conditions that are physical disabilities as well as some minor cognitive disabilities that affect her ability to compete in the workplace unless accommodations are provided, according to the acts' definitions. These disabilities were present daily while she worked for the EagleHerald and covered the city and county of Menominee, Michigan in 2021 and 2023 before she was told to turn over the key to the newsroom and leave the premises for no cause other than discrimination. The company also excluded her when it failed to return her phone messages and emails. Besides this obvious discrimination, the PLAINTIFF points out Adams Publishing has a track record of discriminating against women and particularly older women, as none of its Editors or Executive Editors were women in the division she worked in. She had competed for the position of Regional Executive Editor in the spring of 2021 and was

interviewed three times for the position. During an in-person interview, she met several Editors in the group and learned all of the editors in the group were men. She accepted a lower-level position at the EagleHerald as it was the only one made available to her. After she was forced to leave her position in late July 2022, she was replaced by a younger woman. The PLAINTIFF was a 57-year-old professional journalist with over 30 years of experience and an impeccable track record when she interviewed for several positions with the company in 2021 and was 58 when arrived at the EagleHerald in August 2021.

The PLAINTIFF also believes age discrimination was an issue at the EagleHerald. The PLAINTIFF had been given a laptop to use that did not work in Menominee, where internet service was spotty at the time. This is another example of the company's lack of understanding of what providing access means. The PLAINTIFF didn't need the laptop with the tiny screen and poor internet connection as she had a laptop suitable for her needs. The laptop the DEFENDANT wanted her to use had a very small screen, presenting an age issue, as vision often declines with age. The PLAINTIFF is over 40 and has a slight vision issue.

Not only was the PLAINTIFF given a laptop that didn't work in Menominee, ironically, she was falsely accused of trying to take it with her when she was told to turn over the key and leave. This accusation was baloney, as the laptop was still in the box at the EagleHerald. She hadn't used it, except to test its compatibility at her Menominee apartment. The general manager also grossly mischaracterized what occurred in July 2022, slandering the PLAINTIFF to who knows how many people.

The PLAINTIFF suffered from repeated violations of the ADA, which prohibits coercion, interference, exclusion and allows for Equal Protection.

The PLAINTIFF was retaliated against for asserting her rights, for pointing out an employment agreement she was being coerced to sign was unlawful, and for pointing out apparent violations of the Federal Trade Act the newspaper seemed to be willing to commit regularly to cut corners.

The PLAINTIFF also believes she was subject to age and gender discrimination in the position she was offered and held. She is an over-40, single, divorced female with disabilities and receives no government assistance and no alimony. She needs and deserves a wage or salary commensurate with her considerable experience and education. She had applied for and was interviewed three times for a job at Adams Publishing with a much higher position value, the role of Regional Executive Editor. It was given to a younger, white male, who also didn't last long at Adams Publishing, which has acquired a reputation of having a revolving door. This reputation isn't helping its image in the community, and it may be a reason the general manager didn't generate sufficient numbers to keep the newsroom fully staffed.

Meyer v Adams Publishing Group

The PLAINTIFF, who worked through her own company prior to joining the DEFENDANT employer and continues to own and work through her company, an LLC, also was told she couldn't work on a website she had launched, while she was employed by the EagleHerald, despite the fact she was an hourly nonexempt worker earning $17 an hour and wasn't paid for all of her hours. The PLAINTIFF believes this exclusionary act also was a violation of the Sherman Act, which bars anticompetitive behavior. That the DEFENDANT would attempt to bar a journalist from blogging on her own time is another example of exclusion. The way she was presented with this as an ultimatum was a form of coercion, another ADA violation.

The PLAINTIFF made a point of discussing a physical health condition with her supervisor, the editor of the EagleHerald, before she started her job because she needed to push back her start date to accommodate receiving a medical treatment in August. 2021. The company accommodated this.

The PLAINTIFF was blocked from returning to her position or others at Adams Publishing Group by a note in her personnel file saying not to rehire her, despite the fact no one at the company has explained the reason for this. Thus, the discrimination and exclusion has continued.

The PLAINTIFF hasn't had any recent luck finding a new full-time role, despite searching for over a years, and she believes the DEFENDANT 's discriminatory and retaliatory acts against her are a contributing factor, as they raise questions about why she was only employed for 11.5 months. Further, the PLAINTIFF suspects the slander and libel she faced at the hand of the general manager have damaged her reputation, which was stellar before she joined Adams Publishing Group.

The PLAINTIFF is freelancing for a newspaper, working remotely from her townhouse in Evanston, Illinois, but not earning anywhere near enough to cover her bills and to get rid of the debt she has accumulated since being excluded from her role and others at the DEFENDANT company in 2022. As of this writing, she has about $34,000 in credit card debt, some of which is coming due in November and December of this year, and she has had to draw out funds early from 401Ks and IRAs, including cashing out two small 401Ks entirely and making a dent in a third to survive during a period of unusually high inflation. She does not have sufficient funds to retire at age 67, and her Social Security check will be meager. The forced resignation has set her back considerably, and likely reduced the size of her future Social Security retirement benefit. She also had to pay for COBRA, which was expensive, for six months. She currently has a subsidized Affordable Care Act plan.

The PLAINTIFF doesn't have sufficient funds to attempt to build out her business beyond freelance writing and editing at this juncture.

The PLAINTIFF also doesn't have sufficient funds to hire an attorney, as they charge between $300 and $675 an hour.

The PLAINTIFF also doesn't have sufficient funds to retire, nor is she of retirement age. She is not eligible for Social Security currently. If she applies for Social Security retirement benefits prior to her full retirement age of 67, it won't be anywhere near enough to cover her ordinary living expenses.

The ADA works in tandem with other laws. The law states: "(b) Interference, coercion, or intimidation. It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of … any right granted or protected by this chapter," including employment. The Act also provides for remedies when Retaliation, Interference, Coercion or Intimidation are factors in the discrimination, as discussed in more detail later. The ADAAA also works with other employment laws prohibiting gender discrimination and equal pay violations, and the DEFENDANT company had a reputation for favoring white men over women, particularly for higher paying positions. This was made clear to the PLAINTIFF in the months after her job ended, as the DEFENDANT company has failed to rectify what she considers to be egregious law violations by a white male.

The way the PLAINTIFF's was discriminated against and excluded on July 28 – with general manager, a white male, calling the police at about 9:15 a.m. on July 28 to remove the PLAINTIFF from the newsroom -- was so outrageous as to be a violation of U.S.C. 241, which many call a hate crime because it violated the PLAINTIFF's First Amendment right to freedom of speech and freedom of the press. On July 27 and July 28, the PLAINTIFF was working on a follow-up news story about the Menominee, Michigan, schools referendum on the election ballot the following Tuesday. The story was about a controversy about the actual wording of the referendum ballot, and the numbers used in it. The PLAINTIFF had received a tip from a source who suggested the school district hadn't been up front with the public in the amount of money involved. The PLAINTIFF has reason to believe the general manager didn't want the story in the paper because it might cast the school board president in an unflattering light, and the school board president also worked as an executive at a major furniture company based in Menominee that was an advertiser. The fact general manager failed to consult with the PLAINTIFF's supervisor or the Regional Executive Editor or another editor in the news group or Adams Publishing's VP of Print and Digital Content, is germane to this matter.

The PLAINTIFF asserts the discriminatory and exclusionary acts were so oppressive, given the work she was doing was covered by the First Amendment, as to be a hate crime against a journalist. More

Meyer v Adams Publishing Group

information about U.S.C 241 is contained in the STATUTES section of this complaint. She also suspects the acts were retaliatory in nature for information she provided in an effort to help the newspaper.

The PLAINTIFF was hired as an hourly, nonexempt staff writer for a very modest $17 an hour during a period of high inflation. The DEFENDANT not only excluded her from other positions by failing to train her on the page decision system, which it offered to every other newsroom employee, but it then barred her from enjoying her Constitutional right to freedom of speech and freedom of the press when it barred her from blogging on her own time.

The editor of the paper was her direct supervisor, and he asked her to be on the lookout for – and to shoot -- newsworthy photos for the newspaper during her off hours, when she wasn't on the clock and wasn't technically an employee according to laws governing nonexempt employees.

Discrimination can take many forms. No one should be excluded, coerced, or retaliated against by their employer. For the PLAINTIFF and others with disabilities affecting their ability without assistance to lead a normal life, employment laws are even stronger. Employees aren't required to announce their disabilities, due to privacy considerations, but they are protected from discriminatory practices in employment, including retaliation, which can take many forms, such as blacklisting the employee from other opportunities. (More on this is contained under STATUTES later in this brief.)

The PLAINTIFF is seeking access and relief from ongoing discrimination and unfairness, including compensation. The PLAINTIFF is bringing this complaint because the discrimination she faced from her previous employer, Adams Publishing Group, the DEFENDANT, was egregious, harmful and so uncalled for as to require the DEFENDANT to be called out for their violations of the law, taken to task and held accountable.

The PLAINTIFF's compound medical disability can be fatal. It involves four separate but related conditions affecting respiratory and cardiovascular health: 1) asthma, 2) a chronic sinus condition involving nasal and sinus polyps that constrict her ability to breathe freely through her nasal passages, 3) allergies to many natural and manmade substances, including chemicals and additives found in common products, such as perfume, paint and some foods and alcohols, and 4) a lack of sense of smell. Her symptoms can include wheezing, shortness of breath and difficulty breathing; sneezing, coughing and congestion in her nose, sinuses, chest and throat; difficulty speaking; cardiac issues stemming from lack of oxygen; headaches and other pains; dizziness, lightheadedness, and fatigue; digestive issues related to allergens; and inability to smell odors and scents. Besides this, she suffered from spiking pain headaches that at times were excruciating while employed at Adams Publishing Group.

Meyer v Adams Publishing Group

The PLAINTIFF's strengths in the written word make her a highly capable writer of news articles, while her disabilities present health risks others may not have to contend with. She also has dysgraphia, which affects her ability to write legibly quickly while taking notes, and other mental issues. This weakness is easily accommodated with recording devices or a laptop computer, which she often provides so as not to cause an undue burden.

Without enforcement of the American with Disabilities Act, as described later, some companies target people's weaknesses, instead of their strengths, even though this practice is illegal and considered counterproductive to the best interests of the company and society. Individual managers might discriminate against talented people with disabilities to protect their own jobs, and the PLAINTIFF suspects this was the case at the EagleHerald where she was first told she was a survivor of an announced downsizing and then told to leave about six weeks later, as the nervousness about the company's finances continued among the remaining employees, including the general manager who was an employee, not an owner. In general, as the journalism industry has contracted in recent years and workforces have been reduced, job insecurity in newsrooms has increased, exacerbating discriminatory practices at employers.

Newsroom managers are expected to put the organizations' interests above their own personal interests of staying employed at whatever cost while others are downsized, but this doesn't always happen. The PLAINTIFF believes the discrimination she faced was a result of the company's practice of allowing managers to protect their own positions rather than looking out for the interests of the company, as the discrimination was not in the company's best interests.

The PLAINTIFF believes the managers' concerns about being downsized from the DEFENDANT's operations contributed to the discrimination she faced at Adams Publishing Group.

By discriminating against employees with disabilities and excluding them from the company, these managers may gain job security, unless they are called to task for these illegal, discriminatory practices. Meanwhile, those with disabilities who are downsized have a difficult time regaining employment because of the discrimination they face. The DEFENDANT's egregious practices must be addressed. To fail to address them is to condone them.

## NATURE OF THE ACTION

The PLAINTIFF brings forth this action for injunctive, equitable, compensatory, declaratory and punitive relief from the DEFENDANT 's discriminatory acts, which are in violation of the American with Disabilities Act of 1990 (ADA) and of the Act as amended in the ADA Amendments Act of 2008

Meyer v Adams Publishing Group

(ADAAA) and other laws the DEFENDANT  allegedly violated that also could have contributed to discrimination and retaliation.

**Injunctive relief:** In so much as the DEFENDANT  has continued to exclude the PLAINTIFF from employment for no reason other than the PLAINTIFF'S disabilities and unlawful retaliation and discrimination, the DEFENDANT  seeks injunctive relief in the form of a court order enjoining the DEFENDANT  from these unlawful activities, such as blacklisting.

**Equitable relief:** In so much as the DEFENDANT is one of the nation's largest print and digital news companies by number of outlets, the PLAINTIFF seeks equitable relief to determine a fair resolution.

**Compensatory damages:** In so much as the DEFENDANT;s failure to adhere to the ADA and ADAAA, the PLAINTIFF seeks compensatory damages and expectation damages from its breach of these employment laws and other losses the PLAINTIFF incurred as a result of this dispute and the DEFENDANT's negligence.

The PLAINTIFF also seeks damages in the form of a monetary award for loss and injury.

The PLAINTIFF seeks this court's assistance in her desire for legal representation by allowing for her legal fees to be paid prior to the end of the litigation.

The PLAINTIFF has attempted to resolve this matter on her own without success. She has spent considerable time and resources on this matter because it is so blatantly unlawful and hypocritical. As a news organization, the DEFENDANT should be held to a higher standard because it holds other organizations accountable through the news it reports. The PLAINTIFF believes an order from this court allowing for relief will allow her to retain an attorney in this matter in the near future.

The PLAINTIFF brings this action pursuant to the ADA and ADAAA, to enjoin such discriminatory acts as failure to hire, harassment, defamation, coercion and blacklisting from employment opportunities, and to obtain declaratory and punitive relief from such discriminatory practices as harassment, retaliation and exclusion from her job, and to obtain immediate declaratory relief in the form of legal assistance to carry this COMPLAINT forward so justice can be served.

## JURISDICTION AND VENUE

The United States District Court for the Western District of Michigan has jurisdiction over this action pursuant to the Americans with Disabilities Act of 1990 and the Americans with Disabilities Act Amendments Act of 2008 (ADAAA) which effective Jan. 1, 2009, broadened the definition of disability. Jurisdiction of the Court exists in that this action arises under federal laws, and on July 24, 2024, the

Meyer v Adams Publishing Group

Equal Employment Opportunity Commission provided the PLAINTIFF with a "Notice of Your Right to Sue."

Venue is proper in the U.S. District Court for the Western District of Michigan as the PLAINTIFF lived in Menominee, Michigan, and was hired as the designated Menominee, Michigan, reporter for the EagleHerald newspaper and she covered the city and county governments in person in Menominee. Certain of the acts, practices and courses of business constituting violations of the federal Americans with Disabilities Act of 1990 (ADA) and Americans with Disabilities Act Amended Act of 2008 (ADAAA) alleged herein occurred within the U.S. District Court for the Western District of Michigan's area.

## THE DEFENDANT

DEFENDANT Adams Publishing Group is the owner of the EagleHerald newspaper, which is the local paper covering the city and county of Menominee, Michigan and circulating to Menominee residents. Adams Publishing Group's headquarters are in Minneapolis, Minnesota.

## THE PLAINTIFF

PLAINTIFF Ann A. Meyer is divorced, single, female, professional journalist over 40 years of age with physical disabilities. She is not an attorney. She has a bachelor's degree in journalism conferred as a "done diploma" meaning it was intended to be a terminal degree. She returned to school in 2008 to study management and marketing and received a master's degree in nonprofit administration with distinction in 2011.

PLAINTIFF was an employee of DEFENDANT  Adams Publishing Group's EagleHerald newspaper, from Aug. 9, 2021, to July 28, 2022, at which time she was retaliated against and excluded from her job with a show of force and excluded from working not only at the EagleHerald but from competition within 50 miles.

PLAINTIFF has qualified medical disabilities, involving a respiratory and sinus condition she controls through medication and a regimen of self care. She also suffered spiking pain headaches while working for the EagleHerald, though these have largely subsided.

PLAINTIFF also has cognitive or "mental" disabilities, including dysgraphia.

PLAINTIFF is an award-winning journalist and member in good standing of several professional associations, including the Society of Professional Journalists. She holds lifetime international honors in three professions: journalism, business and the study of nonprofits and social enterprises. She also was nationally named to Who's Who in Journalism. She has served as a top editor of six publications and worked for several national news organizations prior to joining Adams Publishing Group, which is among

the nation's largest newspaper publishers by number of outlets. She joined Adams Publishing during a peak period of Covid-19 and worked in person as a reporter covering Menominee.

PLAINTIFF has studied the field of journalism since her college days, when aside from coursework and training at four different internships, she was a member of the editorial team producing *Byline, Northwestern's Journalism Review*, for three years and served as its editor her last quarter at Northwestern University. This combined experience led to her receiving the "done" designation on her diploma, which is an honor. She has continued to keep up with developments in the news industry and the profession of journalism in the decades since then. Her experience includes employment at a Time Inc.-own newspaper group, several national magazines and newsletters -- including Mature Outlook magazine and newsletter, Dairy Foods magazine and newsletter, and CSP magazine and CSPdailynews.com -- and news reporting experience for a Poynter Institute-owned newspaper, GateHouse Media, Gannett, and Adams Publishing Group. She also served as a weekly columnist for Tribune Publishing flagship paper Chicago Tribune as an independent journalist, working through her business. She worked through her own company for 25 years, contributing to dozens of publications and serving as an outsourced publications editor and contributing writer to Meredith Publishing, Stagnito Media's Retail Leader magazine, newsletter and news site, Maiden Name Press' el Restaurante magazine, and Maxwell Sroge Publishing's Catalog Marketer and NSM Report newsletters. She also has helped to launch and manage several publications, including SmallBizChicago.com (SmallBusinessExecutive), a site she proposed in business plans in 2009 and launched in 2010. The site was live until 2021. The PLAINTIFF also has taught managerial communications at the University of Illinois-Chicago an adjunct lecturer and worked as an enumerator for Census2020, traveling to Iowa for full-time work in the field.


## THE CONTEXT


This isn't a typical employment matter because it involves the profession of journalism and the newspaper business, which is a mission-based business serving the public interest and one of paramount importance to this country's democratic form of government. Historically, the public has relied on newspapers for information and guidance on issues and news of the day. Newspapers hold accountable public figures, government institutions, corporations and charities. While our nation's government has three branches, many consider journalism the Fourth Estate, or the fourth leg of a square table where the other three are the branches of government. When one leg is broken, the table wobbles or crashes and needs to be fixed.

Meyer v Adams Publishing Group

While most companies in other industries are guided solely by profits, the news business has a duty to report on news that could impact its profits. To fail to do so is to deceive readers who expect to receive accurate, unbiased news in a newspaper. To the extent news companies sell subscriptions and ads based on their mission of informing the public accurately and objectively, they aren't allowed to slant the news to please an advertiser. The Federal Trade Commission, the U.S. Department of Justice and other government agencies regulate and, to an extent, govern the newspaper business. Journalists are protected because of the risks they take in informing the public and possibly upsetting a person or entity who could seek revenge, even when the information the newspaper publishes is accurate.

The Federal Trade Commission Act requires full disclosure of advertising versus editorial content because discerning readers look for conflicts of interest in content specifically paid for by advertisers while expecting editorial content to be accurate, unbiased and free of such conflicts. Because of this, most news organizations separate the newsroom from their business operations. Staff writers, reporters and newsroom journalists typically report to the editor of the paper, not to the publisher or general manager, to reduce any potential conflicts of interest. Adams Publishing Group uses a management hierarchy that conforms to this.

The PLAINTIFF reported to the top editor of the EagleHerald, who reported to the Regional Executive Editor. The PLAINTIFF had spoken to the EagleHerald's General Manager Todd Colling on only a couple of occasions as he was rarely in the newsroom as he wasn't supposed to be, and she was not his report. He abused his authority when he approached the PLAINTIFF while she was performing her editorial duties in the newsroom and interfered, telling her she wouldn't be able to log on to the computer and work. The unlawful way in which he did so was an egregious hate crime, a violation of U.S.C. 241. It shouldn't have occurred and the general manager's defamatory comments shouldn't be allowed to stand. They must be removed from personnel file, redacted or cloaked.

In the PLAINTIFF's own words: "The way I was terminated was traumatic, as no one who shows up for work on time, turns on the lights and sets out to perform their job duties expects to – nor deserves to – be escorted from their place of employment by a police officer and terminated from their job without cause."

Mr. Colling called the police when the editor, the PLAINTIFF's supervisor, wasn't present. The PLAINTIFF was the only person in the newsroom at the time, and she believes this contributed to the general manager's over-reach and error in judgment: "When the police officer arrived, the officer listened to the man who stood next to my workstation (Mr. Colling) and didn't inquire as to why he wanted me to give him my newsroom key, which didn't make any sense.

In the PLAINTIFF's own words: "I suspect he had suffered a bad night's sleep as he didn't look well. When he arrived in the newsroom, he was agitated. I was in the process of writing a follow-up article about the school district's request for new funds on the upcoming ballot when Mr. Colling approached me in the newsroom. He told me I wouldn't be able to sign on to ADP or the computer system (despite the fact I already was logged in to both). I replied I was logged in to both. He then became angry and told me to give him my key to the office, for no apparent reason. When I told him my editor wasn't in yet and I didn't report to the general manager, he called the police. The Marinette police station is directly across the street from the EagleHerald's office, and a police officer arrived in the newsroom almost immediately. I gave the key, and the police officer escorted me out of the building."

## STATUTES AND ALLEGATIONS

### About the Americans with Disabilities Act of 1990 and the ADA Amendments Act of 2008

The Americans with Disabilities Act of 1990 is the federal law that bars employers from discriminating against people with disabilities, including discriminatory exclusion, failure to hire and retaliation. This law also requires employers to provide reasonable accommodations unless they cause undue hardship.

The ADA was amended in 2008 to broaden the definition of disability and the ADA Amended Act of 2008 (ADAAA) affords many of the same protections as the ADA but qualifies more people. These laws exist because the United States of America provides access to those with disabilities and bars punishing them or discriminating against them simply because they're different.

The Americans with Disabilities Act of 1990 states, ADA 1990, SEC. 12101. [Section 2a](7), "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; and states

[Section 2a](8), the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous.

Disabilities don't have to be present every day for someone to have a qualified disability, according to the American with Disabilities Act. The ADA and the amended ADAAA state someone can have a physical or mental impairment, a record of this impairment or be regarded as having a disability to be covered.

### ADA Definition of Disability

The Americans with Disabilities Act of 1990, Sec. 12102 [Section 3, 2A] states the term disability "means a physical or mental impairment that substantially limits one or more major life activities of such individual; a record of such impairment; or being regarded as having such an impairment....Major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working....An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."

### ADAAA Broadens the Definition of Disability

The ADAA has updated this definition, stating, "In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breaking, learning, thinking, concentrating, reading, bending, and communicating, major life activities now include the operation of major bodily functions, such as function of the immune system, special sense organs and skin, normal cell growth, and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions, or the operation of an individual organ within a body system."

The length of time the disability affects the person can vary. The ADAA states, "An impairment may be substantially limiting even though it lasts or is expected to last fewer than six months."

The Americans with Disabilities Act and the ADA Amendments Act are designed to allow those with disabilities to participate in society to the same extent as people without disabilities. Most people want to live productive lives and be able to support themselves. People with disabilities often don't talk about their disabilities because doing so might lead to more discrimination. A certain percentage of people seem to enjoy poking fun at other people with weaknesses. This form of bullying apparently energizes them or elevates their own stature because it makes them feel superior. The PLAINTIFF has observed this over and over and over in people in all professions and walks of life, from doctors and lawyers to supervisors.

Meyer v Adams Publishing Group

Other people, such as professional colleagues, members of organizations and hiring managers, exclude people with disabilities because they don't feel comfortable around them. This exclusion and segregation is illegal.

The Americans with Disabilities Act of 1990, SEC. 12112 [Section 102a] states, "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

The Act defines discrimination [Section 102a1] as, "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee."

Discrimination also includes [ADA of 1990, SEC. 12112 (Section 102b3)], "utilizing standards, criteria or methods of administration that have the effect of discrimination on the basis of disability or that perpetuate the discrimination of others who are subject to common administrative control." This means managers and corporate systems shouldn't be allowed to discriminate.

The PLAINTIFF doesn't want to be known for her disabilities, and thankfully they haven't been a defining issue for her largely because she generally doesn't mention them. Federal laws such as the Health Insurance Portability and Accountability Act of 1996 (HIPAA) afford people privacy related to medical issues and disabilities. According to the Centers for Disease Control and Prevention, HIPAA created "national standards to protect sensitive patient health information from being disclosed without the patient's consent or knowledge."

The discrimination and retaliatory acts the PLAINTIFF faced took several forms and violated a number of regulations within the Americans with Disabilities Act.

**Exclusionary actions**

The PLAINTIFF was excluded from the position she was hired for when she was told to turn over the key to the office and leave on July 28, 2022.

The PLAINTIFF was blocked from pursuing other job opportunities at Adams Publishing by a note in her personnel file saying she shouldn't be rehired.

The PLAINTIFF while employed by Adams Publishing was excluded from working on a website she started in 2010 through her own business and had relaunched in 2020, including during her off hours when she wasn't being paid. This damaged her business significantly. The site or blog focused on

Meyer v Adams Publishing Group

business news from the Chicago area and wouldn't have affected her Menominee coverage at all. This exclusion damaged her business significantly.

The PLAINTIFF was excluded from pursuing certain stories in the public interest requiring public documents because the company didn't have the resources to pay the copying fees the local governments imposed. She used other creative means as often as possible.

The PLAINTIFF was excluded from training sessions on the page layout system in 2021, which also prevented her from serving as a day editor. She was the only newsroom staff writer to be excluded from this training opportunity.

The PLAINTIFF was excluded from serving as a daily editor on a repeated basis for months because she wasn't trained on the page layout system.

The PLAINTIFF was disadvantaged and discouraged from applying for other positions, including promotions, at Adams Publishing Group while she was an employee because she didn't have experience on its page layout system.

The PLAINTIFF was excluded from pay when she wasn't compensated for extra hours she worked, including time during the weekends when she often scouted for story ideas and shot photos. She believes she was misclassified and should either have been hired as an exempt employee at a higher salary or through her business as the company provided so little service to her. This would have allowed her to continue working on her website or to pursue other paying customers without fear of retaliation.

The PLAINTIFF was excluded daily and continuously for months from working for other companies in the Menominee area after she left Adams Publishing because the DEFENDANT didn't tell her it didn't intend to enforce a noncompete triggered by "termination" so she wasn't aware of this fact.

The PLAINTIFF was excluded from receiving unemployment compensation for six months in 2022 and early 2023 because the general manager didn't accurately describe the way she left her position in July 2022. This caused considerable financial hardship as without income, she had to cut costs to the bone. This affected her lifestyle and also her ability to network to find a job or jumpstart her business.

The PLAINTIFF's side business of real estate rental also was affected when she had to relocate and move in to a townhouse she owns in Illinois because she wouldn't qualify for a lease without income. She is still living in the townhouse because housing costs are higher elsewhere so she can't afford to move. This means she is not renting it out.

Meyer v Adams Publishing Group

**Limited and classification violations**

The PLAINTIFF was limited in a way that adversely affected the opportunities and status afforded her when the DEFENDANT failed to allow her to work and failed to hire her for other suitable positions. Considering her extensive experience, education and training, she was highly qualified for most editorial positions in the company. This is a violation of the ADA and the ADAAA

> According to the ADA of 1990 SEC. 12112. *[Section 102]* (b) As used in subsection (a) of this section, the term "discriminate **against a qualified individual on the basis of disability**" includes (1) **limiting**, segregating, or **classifying a job applicant** or employee in a way that **adversely affects the opportunities** or status of such applicant or employee because of the disability of such applicant or employee.

The ADA of 1990 states:

> "(a) Retaliation. No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

> "(b) Interference, coercion, or intimidation. It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter."

As stated above, the goal of the ADA and ADAAA is to provide access and inclusion.

> According to the Equal Employment Opportunity Commission and the Americans with Disability Act of 1990, SEC. 12101. *[Section 2]* (a) Findings, "the Congress finds that:

> **(1)** physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination; others who have a record of a disability or are regarded as having a disability also have been subjected to discrimination;

Meyer v Adams Publishing Group

(2)    historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem.

The discrimination often affects the individual not only in the workplace, but also in other areas, such as housing, education, recreation, health services, and legal services.

4) individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination. ADA 1990, SEC. 12101. *[Section 2a, 4]*

## Remedies

The Act also provides for remedies when Retaliation, Interference, Coercion or Intimidation are factors in the discrimination.

The Act states, "(c) Remedies and procedures. The remedies and procedures available under sections 12117, 12133, and 12188 of this title *[sections 107, 203 and 308]* shall be available to aggrieved persons for violations of subsections (a) and (b) of this section, with respect to subchapter I, subchapter II and subchapter III, respectively, of this chapter *[title I, title II and title III, respectively."*

Section 12188 (2) (1)( b) Enforcement allows the court to grant such temporary, preliminary and permanent relief as it considers appropriate, including monetary damages to the aggrieved persons and civil penalties of up to $50,000 for the first violation and $100,000 for subsequent violations.

## Age Discrimination in Employment Act of 1967

According to the Age Discrimination in Employment Act of 1967 (ADEA) SEC. 623. *[Section 4]* (a) Employer practices: It shall be unlawful for an employer

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or

(3) to reduce the wage rate of any employee in order to comply with this chapter.

Meyer v Adams Publishing Group

https://www.eeoc.gov/statutes/age-discrimination-employment-act-1967

According to the EEOC, "An employment policy or practice that applies to everyone, regardless of age, can be illegal if it has a negative impact on applicants or employees age 40 or older <u>and is not based on a reasonable factor other than age</u> (RFOA)."

"The law prohibits discrimination in any aspect of employment, including hiring, firing, pay, job assignments, promotions, layoff, training, benefits, and any other term or condition of employment."

"Age discrimination involves treating an applicant or employee less favorably because of his or her age. The Age Discrimination in Employment Act (ADEA) forbids age discrimination against people who are age 40 or older. It does not protect workers under the age of 40, although some states have laws that protect younger workers from age discrimination. It is not illegal for an <u>employer or other covered entity</u> to favor an older worker over a younger one, even if both workers are age 40 or older. Discrimination can occur when the victim and the person who inflicted the discrimination are both over 40." https://www.eeoc.gov/age-discrimination

## Title VII of the Civil Rights Act of 1964

The Civil Rights Act of 1964, Title VII, SEC. 2000e-2. *[Section 703]* prohibits discrimination because of sex, race, religion and national origin, stating:

It shall be an unlawful employment practice for an employer

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

(d) Training programs. It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training. https://www.eeoc.gov/statutes/title-vii-civil-rights-act-1964

## The Ledbetter Fair Pay Act of 2009

The PLAINTIFF was denied fair compensation when the DEFENDANT failed to consider the extent of her experience and training. This is a violation of the Lilly Ledbetter Fair Pay Act, which includes a modification of the Americans With Disabilities Act of 1990, to clarify that: "a discriminatory compensation decision or other practice that is unlawful under such Acts occurs each time compensation is paid pursuant to the discriminatory compensation decision or other practice, and for other purposes."

The "Lilly Ledbetter Fair Pay Act of 2009" extends the amount of time allowed to file for wage and salary discrimination under the ADA Act:

> (3) With regard to any charge of discrimination under any law, nothing in this Act is intended to preclude or limit an aggrieved person's right to introduce evidence of an unlawful employment practice that has occurred outside the time for filing a charge of discrimination.
> https://www.govinfo.gov/content/pkg/PLAW-111publ2/html/PLAW-111publ2.htm
>
> (a) Americans With Disabilities Act of 1990.--The amendments made by section 3 shall apply to claims of discrimination in compensation brought under title I and section 503 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq., 12203), pursuant to section 107(a) of such Act (42 U.S.C. 12117(a)), which adopts the powers, remedies, and procedures set forth in section 706 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-5).

**Fair Labor Standards Act**

The PLAINTIFF, a nonexempt wage earner, also was the victim of Fair Labor Standards Act violations regarding hours worked and overtime pay for working over 40 hours a week. These violations also discriminatory.

> According to the U.S. Department of Labor, the Fair Labor Standards Act for overtime states, "covered nonexempt employees must receive overtime pay for hours worked over 40 per workwork (any fixes and regularly recurring period of 168 hours or seven consecutive 24-hour periods) at a rate not less than one and one-half times the regular rate of pay. There is no limit on the number of hours employees 16 years or older may work in any workweek. The FLSA does not require overtime pay for work on weekends, holidays or regular days of rest, unless overtime is worked on such days."

The PLAINTIFF didn't receive pay for all the hours she worked, sometimes because the app she was supposed to use to log in and out to the timesheet wasn't always functional in Menominee. This led to a violation of the Fair Pay Act's Hours Worked provision.

The Hours Worked provision provides, "Hours worked ordinarily include all the time during which an employee is required to be on the employer's premises, on duty, or at a prescribed workplace." https://www.dol.gov/agencies/whd/flsa

The PLAINTIFF was excluded from a pathway to promotion when she was denied the opportunity to learn the page design system and serve in the rotation as a day editor in 2021. She was the only newsroom employee not to be trained on the page layout system.

The ADA of 1990 SEC. 12112. *[Section 102] prohibits* (B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant.

### U.S.C. 241 prohibits Constitutional violations

The PLAINTIFF believes the way she was forced to turn over the newsroom key and leave the office was so egregious as to be a violation of U.S.C. 241.

U.S.C. 241 states: "If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

"If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

"They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death."

"The Act remains virtually unchanged today as Section 241 provides fines of up to $10,000 and imprisonment of up to ten years" for those who violate this federal statute, according to a University of Chicago 1995 white paper by R. Paul Margie. https://web.archive.org/web/20230803145300/https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=1193&context=uclf

Sherman and Clayton Acts

Because the PLAINTIFF also is the owner of a business in good standing in the state of Illinois, which she has returned to, the discriminatory action also violates the Sherman Antitrust Act of 1890 (26 Stat. 209, 15 U.S.C. §§ 1–7). This is another antitrust law establishing and requiring free competition and prohibiting unfair monopolies that disadvantage small businesses. The Clayton Act prohibits unwanted mergers.

WHEREFORE, PLAINTIFF respectfully requests the court grant

a) legal counsel knowledgeable about disability discrimination in employment and the newspaper business. The PLAINTIFF isn't a lawyer and will need counsel to determine what the law provides in terms of relief in this case;

b) injunctive, equitable, compensatory, declaratory and punitive relief, from the DEFENDANT'S discriminatory acts, which are in violation of the American with Disabilities Act of 1990 (ADA) and of the Act as amended in the ADA Amendments Act of 2008 (ADAAA) and other laws the DEFENDANT allegedly violated that also could have contributed to discrimination and retaliation;

c) Immediate compensatory relief, as the PLAINTIFF has significant expenses and bills that need to be paid;

d) other relief the court deems appropriate.

Respectfully submitted,

Ann Meyer
*Pro Se*
847-271-0177
ameyerwrtr@aol.com

Oct. 17, 2024



Ann Meyer
3308 Central St
Evanston, IL
60201

